Filed 6/23/15

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE, | 2d Crim. No. B251469 |
|   Plaintiff and Respondent, | (Super. Ct. No. BA408665-01) |
| | (Los Angeles County) |
| v. | |
| RICHARD SOKAU, | |
|   Defendant and Appellant. | |

"I object." This will catch the attention of the trial court every time. Silence will seldom, if ever, catch the attention of the trial court. Where a defendant is represented by competent counsel, one would surmise that "botched interpretation" from a foreign language to English would cause counsel to object. Confronted with an objection, we presume that the trial court would rule on the objection, perhaps sustain it, and provide a remedy. Or, the trial court could overrule the objection, make a record, and preserve the claim for appellate review. Where, as here, there is no objection, there is no trial court ruling. The Court of Appeal reviews rulings of the trial court. This pronouncement does not present an insurmountable obstacle for defense counsel. All counsel has to do is object, state a basis for the objection, and press for a ruling. As we shall explain, here there is no ruling to review and the "ineffective assistance of interpreter" claim has been forfeited.

Richard Sokau appeals his conviction by jury of two counts of assault with a deadly weapon, 40 ounce beer bottles. Appellant admitted a prior serious felony conviction for assault with a deadly weapon. He was sentenced to state prison for seven years.

Appellant contends that he was not provided a competent interpreter and that it denied him a fair trial. We affirm.

*Facts*

While on a lunch break, Eleazar Espitia saw appellant and appellant's girlfriend argue with Shayne Miranda, the victim. Miranda was sitting on the sidewalk in a cul-de-sac park area where homeless people congregated. Espitia saw appellant take a large beer bottle from a shopping cart and smash it on Miranda's head. Appellant went back to the shopping cart, grabbed another bottle and threw it at Miranda, shattering the bottle. Miranda got up and briskly walked away as blood poured down his face. Espitia had his work manager call the police, and followed appellant until the police arrived.

Police officers found Miranda walking down the street, dirty and bleeding. Miranda did not want to talk to the police and was taken to a hospital. He was treated for facial and scalp lacerations with glass fragments in his head, a facial bone fracture, and a left temporal laceration that required sutures. Miranda was combative with hospital staff, tested positive for canaboids, and had an alcohol blood level of .302 percent.

On the first day of trial, appellant asked for and was provided a Palauan interpreter. Appellant testified that Miranda touched his girlfriend and made sexual advances toward her. Appellant told Miranda to stop. Miranda kicked at appellant. Appellant testified that he kicked back and that Miranda fell and hit his head on the concrete curb. He denied using 40 ounce beer bottles to assault Miranda.

*Forfeiture of Interpreter Competency Issue*

Our state Constitution provides that a criminal defendant who is "unable to understand English" has the right to an interpreter. (Cal. Const., art. I, § 14.) A non-English speaking defendant in a criminal case has a right to a competent interpreter. (*People v. Estrada* (1986) 176 Cal.App.3d 410, 415.) "An interpreter must render a true translation of the questions posed and answers given. [Citations.]" (*People v. Shaw* (1984) 35 Cal.3d 535, 542.) We have no quarrel with these rules. We do quarrel with the premise thereto, i.e., appellant's ability to understand and speak English as well as the competency of the interpreter provided.

2

Appellant, age 49, was born in, and lived in, the United States and appeared to be fluent in English. Appellant did not ask for or require an interpreter at the preliminary hearing, his arraignment, during jury selection, or at the sentencing hearing when he admitted a prior serious felony conviction. The trial court expressly commented, "I know you speak pretty good English."

On the first day of trial, appellant said that he would feel "more comfortable" with a Palauan interpreter. Thereafter appellant took the witness stand and answered the first two questions in English. The trial court told appellant to wait until the questions were interpreted into Palauan and to answer in Palauan. Appellant answered the next question in English and was admonished: "You need to wait until the interpreter interprets from English into Palaun for you, Okay?"

When appellant was asked where the assault occurred, the interpreter stated, "He does not know the exact name of the park." Defense counsel asked: "[I]s it possible your honor, to request that the interpreter translate in the first person[?]" This was a suggestion. It was not an objection. Assuming that there was "ineffective assistance of interpreter," appellant forfeited the error and is precluded from raising interpreter issues for the first time on appeal. (*People v. Romero* (2008) 44 Cal.4th 386, 411; see also *Keener v. Jeld-Wen, Inc.* (2009) 46 Cal.4th 247, 264-265. "The reason for this rule is to allow errors to be corrected by the trial court and to prevent gamesmanship by the defense. [Citations.]" (*Ibid*.) When no objection is raised to the competency of the interpreter during trial, the issue cannot be raised on appeal. (*People v. Aranda* (1986) 186 Cal.App.3d 230, 237.) Phrased otherwise, there is no ruling to review. Appellant did not make a specific objection concerning the accuracy of interpretation or competency of the interpreter.. Appellant had an obligation to "press" for a ruling and the election not to do so is a forfeiture thereof. (*People v. Obie* (1974) 41 Cal.App.3d 744, 750; see also *People v, Samayoa* (1997) 15 Cal.4th 795, 827.)

3

## Comment on The Merits

Appellant argues that he was denied a fair trial because the interpreter was repeatedly admonished not to translate in the third person.  The trial court instructed the interpreter "to speak the precise words that he [i.e., appellant] speaks."  It was a continuous problem because appellant responded with long narrative answers.  He was instructed to "keep your answers short so we can be sure that the interpreter can repeat exactly what you say."  The trial court asked defense counsel to "ask him slightly more direct[] questions, so it doesn't get into a narrative which is too difficult to interpret."  It was a daunting task.

During direct examination of appellant, the trial court called a recess and instructed  the interpreter to "interpret verbatim what [appellant] says. . . .  [¶]  . . .  [¶]  So, I cannot have you speaking in . . . third person. . . .  And I understand that in any translated language there's not always a precise interpretation, but I get the impression that the two of you are having a conversation and then you're relaying in general terms what it is that he said. . . . [W]e're required to have his precise words be the words that you speak.  Can you do that?"

What follows is 28 pages of testimony in which the trial court asked the interpreter to clarify whether appellant was saying "I" or "he."   The trial court attempted to ensure that the questions and answers were properly translated.  (See *United States v. Gomez* (11th Cir. 1990) 908 F.2d 809, 811 [trial courts should discourage interpreters from "embellishing" or "summarizing" live testimony].)  If there was a language problem in the question asked or the answer given, the interpreter either corrected himself or explained the testimony.  Nothing of substance was lost in the translation and appellant's defense was conveyed to the jury.

## Response to Dissent

To the extent that the dissent serves as a "wake-up call" for interpreters, it is to be applauded.  There is, however, some mischief here. The dissent engages in sua sponte intervention  to correct a "problem" that the defendant did not even complain about.  It opines that the court interpreter irregularities resulted in an unfair trial.  To be sure, this

4

approach may serve the interests of the defendant but there are some unspoken considerations at play.

First, defense counsel was "asleep at the switch" and did not present his client's theory of defense to the jury. This is unfair to defense counsel who knew that appellant was sufficiently conversant in English to understand what was transpiring in the courtroom. It is extremely unlikely that an attorney would go forward representing a criminal defendant and remain silent where the jury hears what counsel believes is "botched" interpretation. Second, even though the dissent praises the trial court for its effort, the inference is that the trial court was deficient and presided at an unfair trial. It is a reasonable inference that the trial court believed that while the Palauan translation, while imperfect, was adequate for the jury to understand what appellant was saying. If not, we are confident that the trial court would have fashioned an appropriate remedy. Third, the prosecutor was also deficient and did not recognize the theoretical problem. A reasonable inference is that the prosecutor believed that appellant was conversant in English, did not really require the services of an interpreter, and that the interpretation was adequate. Finally, we observe that the dissent's call for new trial would reward a defendant who, by silence and perhaps stealth, has injected reversible error into the record.

*Conclusion*

Appellant's contention that he was denied a fair trial and suffered prejudice as a result of an incompetent interpreter is at variance with the record. (See *People v. Rodriguez* (1986) 42 Cal.3d 1005, 1010-1013 [applying *Chapman v. California* (1967) 386 U.S. 18 harmless beyond a reasonable doubt standard of review].) The trial was a simple credibility contest. Appellant smashed a 40 ounce beer bottle on the victim's head and then threw another bottle at him. Espitia, a disinterested third party, witnessed the assaults, followed appellant until the police arrived, and identified Miranda and appellant. Espitia returned to the cul-de-sac area the next day and took photos of the blood and the broken glass. At trial, he testified in detail about where the assaults occurred, his vantage point, and how appellant assaulted Miranda. The only explanation for the glass embedded in the

5

victim's face is that it was deposited by appellant.  The glass embedded in the victim's face is a fact.  It cannot be altered at a new trial.

We are precluded from reweighing the evidence or reevaluating the credibility of the witnesses, or in this instance, the competency of the interpreter.  (*People v. Aranda, supra,* 186 Cal.App.3d at p. 237 [question of interpreter's competence is a factual one for the trial court to decide]; *People v. Mendes*  (1950) 35 Cal.2d 537, 543 [same].)  "While the general standard for interpreters requires continuous word-for-word translation, occasional lapses in the standard will not necessarily contravene a defendant's constitutional rights.  [Citation.]"  (*United States v. Long* (9th Cir. 2002) 301 F.3d 1095, 1105.)

Appellant was entitled to a fair trial not a perfect one.  (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009.)  There is no such thing as an error free, perfect trial, or an error free, perfect interpreter.  (See *United States v. Long, supra,* 301 F.3d at p. 1105; *United States v. Gomez, supra,* 908 F.2d at p. 811 [no constitutional right to flawless, word for word translations].)  Appellant was provided an interpreter and told the jury his version of what occurred.  Even with a less than perfect translation, it is obvious that the jury heard his defense.  It was a story that the jury discredited.

The judgment is affirmed.

CERTIFIED FOR PUBLICATION

YEGAN, J.

I concur:


PERREN, J.


6

GILBERT, P.J., Dissenting.

I respectfully dissent. My colleagues' speculation about defendant Richard Sokau's proficiency in English is beside the point. That Sokau did not have an interpreter at the preliminary hearing or sentencing hearing skirts the relevant issue in this case. In my view, the focus should be on the testimony the jury heard through the words of the interpreter. The interpreter failed to accurately interpret the testimony. The degree and pervasiveness of this failure leave a strong doubt in my mind that Sokau received a fair trial. The valiant trial court did its best to correct the problem, but not enough.

A defendant in a criminal trial who does not understand English is entitled to an interpreter. (Cal. Const., art. I, § 14.) This safeguards the defendant's Sixth Amendment right to be "present," to hear the testimony of witnesses, to examine and cross-examine those witnesses, and to testify. The defendant's presence at trial was like being present at a concert and watching the musicians but not hearing the music.

During his lunch break, Eleazar Espitia was sitting in his car eating lunch. He looked across a parking lot in the direction of a cul-de-sac, where homeless people gather. He saw Sokau and his girlfriend arguing with Shayne Miranda, who was "sitting on the sidewalk."

Espitia testified that Sokau "walked towards" a shopping cart, then "headed towards" Miranda, and "smashed," what Espitia termed, "a two-liter bottle" on Miranda's head. Sokau then "went back to the shopping cart and pulled out another bottle" and threw it at Miranda. Espitia saw this incident from "a distance" of 125 feet and said his view was partially blocked by a fence.

Police Officer Omar Ortiz and his partner responded to a dispatch call, and saw Miranda walking down the street. Miranda was "dirty," bleeding and "looked a little confused." Miranda did not want to "provide information regarding what had happened to him."

Sokau testified that he did not hit Miranda with a bottle or throw a bottle at him. Miranda had an alcoholic beverage bottle with him and he was drinking. He began touching Sokau's girlfriend and made sexual advances. Sokau told him to stop. Miranda

1

kicked Sokau and tried to hit him. Sokau kicked Miranda who fell and hit his head "in the parking lot." Miranda had a glass bottle with him when he fell.

A defendant's ability to testify is a fundamental constitutional right. (*Rock v. Arkansas* (1987) 483 U.S. 44, 51-53.) A defendant who does not speak English must rely on an interpreter to communicate his defense to the jury. But the state and federal constitutional right to a fair trial may be compromised where the interpreter does not properly translate the defendant's testimony. (Cal. Const., art. I, § 14; *People v. Romero* (2008) 44 Cal.4th 386, 410; *People v. Nieblas* (1984) 161 Cal.App.3d 527, 529; see also *United States v. Gomez* (11th Cir. 1990) 908 F.2d 809, 811; *United States v. Cirrincione* (7th Cir. 1985) 780 F.2d 620, 634; *People v. Cunningham* (Mich. Ct.App. 1996) 546 N.W.2d 715, 717; *People v. Starling* (Ill. Ct.App. 1974) 315 N.E.2d 163, 168; *Kelly v. State* (Fla. 1928) 118 So. 1, 3.)

Under the California Constitution, a non-English speaking defendant in a criminal case has "a right to a *competent* interpreter." (*People v. Estrada* (1986) 176 Cal.App.3d 410, 415, italics added.) "An interpreter must render a true translation of the questions posed and answers given." (*People v. Shaw* (1984) 35 Cal.3d 535, 542.) "'When bilingual courtroom dialog is exchanged through an interpreter, *literal translation should be exacted of him, without paraphrasing*, because of undetectable differences which may exist between the words spoken and his understanding of their message.'" (*Id*. at pp. 542-543, italics added.)

*Interpretation Gone Awry*

At the beginning of Sokau's direct examination testimony, Sokau's counsel became aware of the interpreter's deficiencies. She requested the trial court to order the interpreter to "translate in the first person." The court ordered him "to tell us exactly what [Sokau] says, not referring to him in the third person." But as the questioning of Sokau continued, the interpreter repeatedly violated this order.

During the middle of direct examination, the trial court called a recess because the interpreter was not properly translating Sokau's testimony. The court had "the impression" that the interpreter was "having a conversation" with Sokau, and then only

2

"relaying *in general terms* what it is that [Sokau] said." (Italics added.) The court found this improper because the jury had not heard Sokau's words. The court did not take corrective action. It did not strike the flawed translated version. Instead, it allowed the flawed translated version to be the evidence presented to and considered by the jury.

Sokau's interpreter often translated Sokau's testimony using third person language. But other times he used Sokau's own words. It was difficult to determine whether the words were Sokau's or the interpreter's. It is no wonder that Sokau's testimony was confusing.

During cross-examination, the prosecutor asked Sokau, "[A]s Mr. Miranda . . . has your girlfriend and is holding her down to the ground, you decide to go use the restroom, correct?" Interpreter: "He went to the bathroom." Prosecutor: "Who went to the bathroom?" Interpreter: "He did." Court: "Who 'he, I'?" Interpreter: "I did."

The prosecutor asked Sokau: "[W]hat did you see her doing in response?" Interpreter: "So after the gentleman tried to touch her, she tried to hit him . . . so he asked her . . . ." Court: "So, who is 'he'? He must have said 'I,' right? Remember?" Interpreter: "That's what I'm saying he said." Court: "*I said you need to say exactly what the witness says*." (Italics added.)

Prosecutor: "What happened after Mr. Miranda and your girlfriend were on their backs and they were touching each other?" Interpreter: "When he got up he asked him not to do that to the girl. The girl also asked him not to do it to her." Court: "When who got up? When the witness got up?'"

Prosecutor: "Did you see what your girlfriend was doing when you were getting kicked by Mr. Miranda?" Interpreter: "While Mr. Miranda was kicking him." Court: "Kicking me. Kicking me."

Prosecutor: "Did he throw a second punch?" Interpreter: "The second action was a kicking to his left upper leg." Court: "Whose left upper leg?"

Prosecutor: "And in response to that did you hit Mr. Miranda back?" Interpreter: "So after he goes back and fell and when he got up, Mr. Miranda--" Court: "Who is 'he'?" When 'I' got up?"

Prosecutor: "Did you see a knife in his hand?" Interpreter: "'He did not.'" Court: "Who is 'he'?"

Prosecutor: "And Sir, you were standing in front of Mr. Miranda before he suffered his injuries yelling at him, right?" Interpreter: "Okay. So he went to the--" Court: "'I.'"

Prosecutor: "And then did you come back and rejoin where Mr. Miranda and the woman . . . were?" Interpreter: "He didn't actually get--" Court: "I didn't."

Prosecutor: "After you kicked him and he fell, did you see . . . him walk? Did you see him get up?" Interpreter: "After he fell, he went to talk to the girl . . . ." Court: "'He.'"

The interpreter's inconsistent use of "he" or "I" to refer to Sokau made it difficult to determine whether Sokau's answers referred to Sokau or Miranda. The prosecutor asked Sokau: "So you had your first three drinks in the first two hours with Mr. Miranda?" Interpreter: "That's all he had." The prosecutor: "[Y]ou continued to drink with Mr. Miranda, right?" Interpreter: "At the time he had put his bottle back into his pocket and it was not available to them including him to drink." Interpreter: "There is a scratch from the kick that Mr. Miranda gave him. When he fell down he stepped on his chest." Prosecutor: "When who fell down?" Interpreter: "When he did."

The prosecutor asked Sokau whether his girlfriend tried to get up after being held by Miranda. Interpreter: "She did. She tried to get up. He held her back. *He was worried that getting up indicating some sort of an aggressive reaction from her and may cause further action toward to get them into a fight*." (Italics added.) This string of words leaves one to wonder whether the reference is to Sokau. Courts should not tolerate interpreting that leads the trier of fact to have to "speculate what this answer means." (*In re Dung T.* (1984) 160 Cal.App.3d 697, 711, fn. 8.)

"'[T]he power to make a literal translation from one language to another . . . depends upon an accurate knowledge of both languages by the translator.'" (*People v. Walker* (1924) 69 Cal.App. 475, 488.)

4

Sokau claimed he was protecting his girlfriend from Miranda's sexual advances. In an effort to impeach Sokau's credibility, the prosecutor asked him: "So [Miranda] was sharing the liquor with your girlfriend after the first sexual advance, right?" The interpreter hesitated and then volunteered a response that revealed his difficulty translating simple language and listening to questions. Interpreter: "I--The word 'friend' doesn't distinguish a man from a woman in our language." But that is also the case in English. The prosecutor did not ask about a "friend," he asked about the "girlfriend." The words "friend" and "girlfriend" are so common that interpreters should have no problem translating them. But in translating Sokau's responses, this interpreter had trouble distinguishing between them, e.g., Interpreter: "The two *girlfriends*--the two *friends* were arguing." (Italics added.)

The interpreter's difficulties with these simple words may have caused jurors to incorrectly conclude Sokau had given inconsistent testimony. The interpreter initially translated Sokau's words to indicate Miranda gave a bottle to Sokau's "*girlfriend.*" In a translated response to a different question, the interpreter said Miranda "was sharing the drink with his *boyfriend.*" (Italics added.) The interpreter's volunteered response about the word "friend" explained his difficulty in translating these words. The trial court should have instructed jurors that the inconsistency in Sokau's testimony was the result of the interpreter's trouble with language and could not be used to impeach Sokau.

The People's exhibit 2 is a photograph of the cul-de-sac. Sokau identified it as the area where the incident took place. The defense also introduced exhibit A--a photograph of the cul-de-sac. Espitia identified it as the place "where the incident happened." Consequently, the prosecution and defense agreed the cul-de-sac was the only relevant area. But in the translated version of Sokau's testimony, the interpreter said Miranda fell "in the parking lot." The parking lot was in a different area than the cul-de-sac.

The trial court knew the interpreter had trouble following its instructions and interpreting simple words such as "he" and "I," "friend" and "girlfriend." The word "cul-de-sac" presented a more difficult challenge, because the alleged assault occurred in the cul-de-sac, not the parking lot. A common problem with some interpreters is they "may

5

leave out words and phrases that they do not understand" and substitute their own "inaccurate word choices." (Hovland, *Errors In Interpretation: Why Plain Error is Not Plain* (1993) 11 Law & Ineq. 473, 476; *Santana v. New York City Transit Authority* (1986) 505 N.Y.S.2d 775, 779.)

I have "grave doubt" about the accuracy of the translated phrase "in the parking lot." (See *United States v. Cirrincione*, *supra*, 780 F.2d at p. 634.) It is inconsistent with all of Sokau's and Espitia's prior undisputed testimony about the location of the incident. It conflicts with their identifications of defense exhibit A and prosecution exhibit 2. The trial court repeatedly highlighted the interpreter's use of his own words instead of Sokau's. The interpreter's selection of the phrase "in the parking lot" may have been a substitute for "cul-de-sac," a more problematic term to translate. This apparent error placed Sokau and Miranda in the *wrong area*. The prosecutor told jurors Sokau's story "does not make sense." Jurors may have rejected the entire defense case based solely on the interpreter's selection of this phrase.

The trial court told the interpreter, "You are not allowed to ask [Sokau] *to clarify. You're not allowed to counsel him*." (Italics added.) Such conduct is a violation of the interpreter's duties. (*People v. Romero*, *supra*, 44 Cal.4th at p. 410.) An interpreter must interpret accurately without "editing" the witness's words. (*Ibid.*) Summarizing witness testimony is improper. (*Ibid.*; Cal. Rules of Court, rule 2.890(b).) "Such summaries do not comport to California constitutional requirements." (*People v. Aguilar* (1984) 35 Cal.3d 785, 791, fn. 7.) But the court took no action to identify the flawed translated version of the testimony and strike it. Again, it let the jury consider the improperly translated version as evidence.

An interpreter's oath is to "make a true interpretation." (Evid. Code, § 751, subd. (a).) Trial courts must require "strict compliance" with this duty. (*People v. Wong Ah Bang*, *supra*, 65 Cal. at p. 306.) Where the interpreter does not comply with his or her oath, the validity of the interpreted proceedings is called into doubt. (*People v. Aguilar*, *supra*, 35 Cal.3d at p. 793, fn. 10.) A qualified interpreter should know the interpreting standards and follow the trial court's interpreting "procedures." ("Prospective Interpreters," *Qualifications*

6

*for Court Interpreting and Self-Assessment* (2014), California Courts, The Judicial Branch of California-http://www.courts.ca.gov/2694.htm; Grabau & Gibbons, *Protecting the Rights of Linguistic Minorities: Challenges To Court Interpretation* (1996) 30 New Eng. L.Rev. 227, 310.)

During Sokau's cross-examination, the trial court interrupted the prosecutor's questions. It said to the interpreter, "Would you please just repeat the question and interpret what he says to you?"

Later the trial court again noted the interpreter was not performing his duty. It said, "Mr. Interpreter, *you need first to interpret the question* and then you need to interpret verbatim what Mr. Sokau says in response." (Italics added.) A non-English speaking witness cannot answer the prosecutor's questions without a translation of "the questions posed." (*People v. Shaw*, *supra*, 35 Cal.3d at pp. 542-543.) "The translation of each question and answer is required by a defendant's right to due process." (*People v. Cunningham*, *supra*, 546 N.W.2d at p. 717; *People v. Starling*, *supra*, 315 N.E.2d at p. 168.)

Here the trial court did not determine how many times the interpreter failed to translate the questions and strike that translated version of the testimony.

Where translated testimony strays into confusing colloquies because of interpreting errors, jurors become distracted and are inclined to draw negative inferences against the defendant. (Grabau & Gibbons, *Protecting The Rights of Linguistic Minorities: Challenges To Court Interpretation*, *supra*, 30 New Eng. L.Rev. at pp. 312-316; Procaccini, *What We Have Here Is A Failure To Communicate: An Approach For Evaluating Credibility In America's Multilingual Courtrooms* (2011) 31 B.C. Third World L.J. 163, 167.) The interpreter's deficient performance hampered Sokau's ability to present a coherent defense.

*An Effort to Correct the Problem*

The exasperated trial court was keenly aware of the interpreter's limited abilities. It suggested defense counsel might have to change her questions to Sokau to make it easier for the interpreter. It told the interpreter, "[I]f you need counsel to break your questions down *so it's easier for you*, just say so." (Italics added.)

7

Later the trial court asked defense counsel not to ask questions that would invite "narrative" responses because it was "too difficult" for translating. It subsequently instructed Sokau to "keep [his] answers short" so the interpreter would be able to translate them. The court placed these restrictions on defense testimony to accommodate an interpreter who had shown his inability to follow instructions and perform his duties. But an interpreter must be able to "*interpret everything* that is said during the entire proceedings." (Cal. Rules of Court, rule 2.890(b), italics added.)

The trial court gave multiple warnings to the interpreter about not using the third person. It said, "I cannot have you speaking" the defendant's words in "the third person." "[W]here the defendant is making a statement to the jury, we're required to have his *precise words be the words that you speak.*" (Italics added.) It repeatedly told the interpreter to use the word "I" when Sokau was speaking instead of referring to him as "he."

The interpreter violated the trial court's orders *39 times* when he translated Sokau's words to the jury in "the third person." The court repeatedly ordered him not to do this. The court had to interrupt Sokau's testimony *15 times* to tell the interpreter that he was not interpreting properly or was not following its orders.

Interpreting problems also occurred when Sokau was not on the witness stand. Sokau's counsel asked for a sidebar. She requested the prosecutor to use different language because the interpreter could not translate his words. She said, "[I]f the district attorney can use the names because the words, it's confusing his translation. I told him to just translate." Court: "That's what he has to do." The trial court allowed the interpreter to continue interpreting.

But counsel's point was that the interpreter was *not able to translate* the words. An interpreter must be able to interpret all of the proceedings. (Cal. Const., art. I, § 14 [defendant's state constitutional right to interpretation "throughout the proceedings"]; *People v. Aguilar*, *supra*, 35 Cal.3d at p. 790.) Moreover, the parties should not be asked to change their language to accommodate the interpreter. Instead, the trial court should find an interpreter who could properly translate what they say. (Cal. Rules of Court, rule 2.890(b); *In re Dung T., supra*, 160 Cal.App.3d at p. 711, fn. 8.)

8

Standard 2.11(a)(6) of the California Judicial Administration Standards requires interpreters to "[u]se the first person when interpreting statements made in the first person. (For example, a statement or question should not be introduced with the words, 'He says . . .')." Introducing a defendant's words with such a phrase impedes the defendant's direct communication to the jury. Some jurors have trouble identifying with defendants who testify with an interpreter. (Wong, *A Matter of Competence: Lawyers, Courts, and Failing to Translate Linguistic and Cultural Differences* (2012) 21 S.Cal. Rev. L. & Soc. Just. 431, 436-437, 440.) Using third person language further isolates them from the jury.

*Waiver*

The majority and the People contend Sokau waived the interpreter issue because his trial counsel did not object to the interpreter's deficiencies at trial. I disagree.

At the beginning of the defense case, Sokau's counsel brought to the trial court's attention the problem with the interpreter using third person language. In my view, this was a sufficient objection. She also advised the court that the interpreter was not able to translate the prosecutor's words. A formal objection to call the problem to the court's attention was unnecessary. The court was aware of this problem as shown by its numerous findings about improper interpreting and the interpreter's continuous violation of the court's orders on interpreting requirements.

The majority simply views this case as a defense counsel's forfeiture issue. Indeed, this case does involve a forfeiture issue--the forfeiture of Sokau's right to a fair trial.

Because of the constitutional right to adequate interpreting, courts in some cases have declined to find a waiver even where defense counsel made no objection and the error occurred with counsel's "acquiescence." (*People v. Aguilar*, *supra*, 35 Cal.3d at p. 794.) It is apparent that defendant's motion for new trial was unnecessary or would have been futile.

*Prejudice*

Sokau contends "it cannot be said beyond a reasonable doubt that the verdict rendered was not affected." (*Chapman v. California* (1967) 386 U.S. 18, 24.) It is true a defendant's rights are not compromised simply because an interpreter makes some mistakes.

9

Some inaccuracies in interpreting are inherent because of the different meaning of words in different languages and because of linguistic and cultural differences. (Wong, *A Matter of Competence: Lawyers, Courts, And Failing to Translate Lingusitic and Cultural Differences*, *supra*, 21 S. Cal. Rev. L.& Soc. Just. 431, 436-437, 440.)

But this case involves something more--a pervasive and continuous failure of the interpreter to perform adequately throughout the trial. As a result, the jury did not hear Sokau's words. They did not hear his defense. The interpreter became a barrier to the presentation of Sokau's case, and Sokau essentially became a stranger to this proceeding. Such a result is not consistent with the California constitutional mandate that criminal defendants have a right to a competent interpreter. (Cal. Const., art. I, § 14; *People v. Aguilar*, *supra*, 35 Cal.3d at pp. 790-791; *People v. Estrada*, *supra*, 176 Cal.App.3d at p. 415.)

Credibility was the critical issue. Espitia said Sokau hit Miranda with a bottle and threw another one at him. Sokau denied he committed those acts. "The outcome of a trial often rests upon the ability of a party or witness to express himself to a jury." (*Santana v. New York City Transit Authority*, *supra*, 505 N.Y.S.2d at p. 776.) But the flawed interpretations hampered Sokau's ability to present a coherent response. The prosecutor told jurors not to believe Sokau because his story "does not make sense." But the jury did not hear his story in his words. Sokau's story was told in the words of the interpreter, resulting in a confusing narrative. "And, since words are the basic components of communication, the manner in which they are spoken and understood is basic to a fair trial." (*Id*. at p. 778.)

The confusing narrative bolstered the prosecution's case. The prosecution claimed Sokau assaulted Miranda, but Miranda did not testify. Espitia testified about his view of the incident, but his view was from a car 125 feet away and partially blocked by a fence. He was looking uphill and could only see Miranda from his "shoulder up." Espitia could not see Miranda's face, his hands, or whether he was armed. He could not remember whether Miranda took defensive action. He had difficulty remembering whether Miranda was bleeding during the altercation.

The defense highlighted contradictions in Espitia's testimony. Espitia said a third man left before the bottle incident. But at the preliminary hearing, he said a third man was present. Espitia said Sokau's girlfriend made "no physical contact" with Miranda. He later said she "gave [Miranda] a few with her hand." He testified she hit Miranda "one or two minutes" before the bottle incident. Espitia later said, "I don't remember when the woman hit the guy." He said Miranda "never put up his hands" to block the blows delivered by Sokau's girlfriend. He later said, " I don't remember." Espitia said Sokau threw the second bottle toward Miranda. But he later said he "*didn't see* exactly where the bottle hit." (Italics added.)

Sokau's defense counsel also noted the absence of physical evidence. Police promptly arrived. But the People did not produce the alleged deadly weapons--the two-liter bottles or bottle fragments. There was no evidence police had recovered or seen the bottles Espitia described.

The prosecutor introduced exhibit 7, a photograph of the cul-de-sac showing an area with broken glass. Defense counsel pointed out the photograph shows "some shards" of glass, but "*the bottles aren't there*." (Italics added.) There was no evidence of "bloody shards" and "no residual evidence" of the type of bottle parts one would expect to see if Espitia's testimony were correct. The prosecution did not produce the shards of glass shown in exhibit 7 or determine whether they contained Sokau's fingerprints. Interestingly, this photograph was taken by witness Espitia "to have proof of what happened there."

There were disputed issues about whether Miranda's injuries were consistent with Sokau hitting him with a bottle, or whether Miranda sustained injuries when he fought, fell, and hit his head on the pavement of the cul-de-sac. Espitia said Sokau and Miranda "were fighting." Sokau said Miranda had been drinking and Miranda had a bottle with him. The parties stipulated that Miranda had a high blood alcohol level. Espitia said he could not tell whether Miranda "had a bottle of vodka in his hand." Sokau's counsel claimed Miranda's facial injuries were not consistent with Espitia's testimony.

The prosecutor told the jury the issue is "Who do you believe?" Consequently, this trial was a credibility dispute where proper interpreting was essential.

11

The trial court may have been reluctant to replace the interpreter because of the potential for delay. It said, "We're four days behind schedule because we've been waiting for an interpreter and we have *an urgent need to get this case finished* . . . ." (Italics added.) Those are important considerations. But where the trial court knows an interpreter is not properly translating the defendant's testimony, as here, it must act to protect a more important interest--the defendant's right to a fair trial.

"[A] defendant in a criminal proceeding is denied due process when . . . the accuracy and scope of a translation at a hearing or trial is subject to grave doubt." (*United States v. Cirrincione*, *supra*, 780 F.2d at p. 634.) "[T]he only cure for the unfortunate situation would have been another interpreter, one who would translate truly, competently, and effectively, each question and answer with due regard for his or her oath to do so." (*People v. Starling*, *supra*, 315 N.E.2d at p. 168.) But the court allowed the interpreter to continue translating.

Interpreting should be a tool to achieve justice. Here it was an obstacle.

I would reverse and remand for a new trial.

CERTIFIED FOR PUBLICATION.

GILBERT, P. J.

12

Leslie A. Swain, Judge

Superior Court County of Los Angeles

_____

Ann Krausz, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Paul M. Roadarmel, Jr., Supervising Deputy Attorney General, Nima Razfar, Deputy Attorney General, for Plaintiff and Respondent.